UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:          06-21627

CIV-JORDAN
/KLEIN





ALICE ALYSE,

     Plaintiff,

vs.

ACTORS' EQUITY ASSOCIATION,
ERIC A. SPROSTY, TWYLA THARP
ABBIE M. STRASSLER,
EMANUEL AZENBERG,
JAMES L. NEDERLANDER,
SCOTT E. NEDERLANDER,
TERRY ALLEN KRAMER, HAL LUFTIG
CLEAR CHANNEL ENTERTAINMENT,
MOVIN' OUT TOUR COMPANY, L.P.,
IRON MOUNTAIN PRODUCTIONS, INC.,
LIBERTY MUTUAL INSURANCE COMPANY.

     Defendants.
_____/

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, ALICE ALYSE ("ALYSE" or "ALICE"), and hereby

files this lawsuit against the Defendants, ACTORS' EQUITY ASSOCIATION ("the

Union"), ERIC A. SPROSTY, TWYLA THARP, ABBIE M. STRASSLER, EMANUEL

AZENBERG, JAMES L. NEDERLANDER, SCOTT E. NEDERLANDER, TERRY ALLEN

KRAMER, HAL LUFTIG, CLEAR CHANNEL ENTERTAINMENT, MOVIN' OUT TOUR

COMPANY, L.P., IRON MOUNTAIN PRODUCTIONS, INC., (hereinafter "MOVIN' OUT

Defendants") and LIBERTY MUTUAL INSURANCE COMPANY and for her cause of

action declares and avers as follows:

**Preliminary Statement**

1.     This is an action brought by Plaintiff, Ms. ALYSE, seeking compensatory and punitive damages, costs and attorneys fees for the breach by the Union of its duty to fairly represent Plaintiff ALYSE with respect to the utilization of the grievance and arbitration procedures contained in the collective bargaining agreement ("CBA") entitled "Agreement and Rules Governing Employment under the Equity/League Production Contract" (hereinafter "the collective bargaining agreement") dated June 28, 2004, as well as the breach other fiduciary and legal duties owed to the Plaintiff, Ms. ALYSE as a dues paying member of the Union.  This action is brought against the MOVIN' OUT Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-5 et seq., the Equal Pay Act of 1963, 29 U.S.C. Section 206(d), and the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101 et seq. for compensatory and punitive damages and attorneys' fees.

**Jurisdiction and Venue**

2.     The Court has jurisdiction pursuant to 28 U.S.C. §1331,  §301 of the Labor Management Relations Act, 29 U.S.C. § 185, Title VII of the Civil Rights Acts of 1964, 42 U.S.C. Section 2000e-5 et seq., the Equal Pay Act of 1963, 29 U.S.C. Section 206(d), the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq.  Venue lies in this District pursuant 28 U.S.C. §1391(b)(2) since the acts and practices occurred here, Plaintiff is located here and a right to sue letter issued by the Equal Employment Opportunity Commission here.

**Parties**

2

3.      Plaintiff, ALICE ALYSE, a/k/a Alice LuAnn Lewitzke (hereinafter "ALYSE"), is at all material times a resident and citizen of Miami-Dade County, Florida.

4.      Defendant, ACTORS' EQUITY ASSOCIATION, is the exclusive bargaining representative of actors employed by the Movin' Out Tour Company, LP ("MOVIN' OUT") and IRON MOUNTAIN PRODUCTIONS (hereinafter "IRON MOUNTAIN") for the purpose of collective bargaining and the administration of the Actors' Equity Association CBA with the employer.   The Union regularly conducts and transacts business in the State of Florida.

5.      At all material times alleged in Complaint, Plaintiff Ms. ALYSE was an employee of MOVIN' OUT, and ACTORS' EQUITY ASSOCIATION acted as her union. Plaintiff is an employee within the meaning of 42 U.S.C. Section 2000e(f).

6.      Defendant, ERIC SPROSTY (hereafter "SPROSTY"), is at all material times the Production Stage Manager of the show MOVIN' OUT, a hit Broadway production comprised of the music and lyrics by the famous artist and Tony and Grammy award winner Billy Joel and conceived of by Defendant TWYLA THARP. SPROSTY is a resident and citizen of Florida.

7.      Defendant, TWYLA THARP (hereafter "THARP"), is all material times the Director and Choreographer of MOVIN' OUT. She is a resident and citizen of the State of New York.

8.      Defendant, ABBIE M. STRASSLER (hereafter "STRASSLER"), is at all material times the General Manager of MOVIN' OUT and employee of Iron Mountain Productions. She is a resident and citizen of the State of New York.

9.     Defendant, EMANUEL AZENBERG (hereafter "AZENBERG"), is at all material times an Executive Producer of MOVIN' OUT and Partner (hereafter the terms "Partner" or "Producer" are referred to as "Owner") of MOVIN' OUT and IRON MOUNTAIN PRODUCTIONS (hereafter "IRON MOUNTAIN"), which is the management company which operates MOVIN' OUT. He is a resident and citizen of the State of Connecticut.

10.    Defendant, JAMES L. NEDERLANDER, is at all material times an Owner of MOVIN' OUT. He is a resident and citizen of the State of California.

11.    Defendant, HAL LUFTIG, is at all material times an Owner of MOVIN' OUT. He is a resident and citizen of the State of New York.

12.    Defendant, SCOTT E. NEDERLANDER, is at all material times an Owner of MOVIN OUT.  He is a citizen of the State of California.

13.    Defendant, TERRY ALLEN KRAMER (hereafter "KRAMER"), is an Owner of MOVIN' OUT. She is a resident and citizen of the State of Florida.

14.    Defendant, CLEAR CHANNEL ENTERTAINMENT (hereafter "CLEAR CHANNEL" or "CLEAR CHANNEL ENTERTAINMENT") is at all material times an Owner of MOVIN' OUT. CLEAR CHANNEL ENTERTAINMENT is listed in the MOVIN' OUT Playbill as located and doing business at 500 East Broward Boulevard, Suite 800, Ft. Lauderdale, Florida 33394, and touts itself as the world's leading producer and marketer of live entertainment events.

15.    MOVIN' OUT TOUR COMPANY, L.P. (hereafter "MOVIN' OUT") is at all material times a limited partnership comprised of the above-mentioned Owner

Defendants. Defendant MOVIN' OUT is an employer within the meaning of Title VII and regularly conducts and transacts business in the State of Florida.

16.    IRON MOUNTAIN PRODUCTIONS (hereafter "IRON MOUNTAIN ") is the management company of MOVIN' OUT.  IRON MOUNTAIN is located in the State of New York.

17.    LIBERTY MUTUAL INSURANCE COMPANY (hereafter "LIBERTY MUTUAL") is at all material times the workmans' compensation insurance carrier of MOVIN' OUT, regularly conducts and transacts business in the State of Florida.

18.    Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission on March 13, 2006 regarding the alleged discriminatory conduct of the MOVIN' OUT Defendants.

19.    Plaintiff received from the Equal Employment Opportunity Commission a Notice of Right to Sue the Defendants on March 29, 2006.  See attached.

### The Facts

20.    Plaintiff ALYSE was born in Milwaukee, Wisconsin to Robert Lewitzke, a Vietnam Vet and member of the VFW (Veterans of Foreign Wars), a factory worker for Briggs' and Stratton, an American lawn mower manufacturer and Moryns Rivas, born and raised in Nicaragua and who moved to the United States and later became an American citizen. At the age of three, young ALICE showed an aptitude for dance and her parents sent her to tap dancing classes. Then, at the age of five, she was accepted into the Milwaukee Ballet School Program and was widely recognized as the number one student in the class. By the age of nine, ALICE won several first place prizes in dance competitions locally and then she was asked to perform at the prestigious

Milwaukee Summerfest event. At the age of eleven, ALICE won the Mayor's Talent Scholarship of Milwaukee in dance thereby furthering her education in ballet. Shortly thereafter, she moved permanently with her mother to Miami, where she lives to this day, and continued with her early dedication to ballet training and dance in general. At the age of thirteen, ALICE joined the Ballet Theatre of Miami where she received her first paycheck in a starring role in the "Nutcracker."  ALICE then auditioned and was accepted into the dance program of the New World's School for the Arts. Realizing her talent, the school placed her immediately at the highest level of ballet, the first time ever an entering student reached that level. Around this time, ALICE was offered full merit scholarships to School of American Ballet in New York City, Boston Ballet, Houston Ballet, Pennsylvania Ballet, Ballet Met in Columbus, Ohio, Harvard and Butler Universities, and The Joffrey Ballet School in New York City, which she accepted and performed with the company. She also accepted a scholarship at Hartford Ballet and performed with the company at the age of fifteen. Then, at the age of sixteen, ALICE won the National Advancement for the Arts First Place Award and received a monetary stipend for this as the representative of the State of Florida.  ALICE also won the National Arts and Letters First Place Award and again received a monetary stipend for this as the representative of the State of Florida.  Shortly thereafter, again at the young age of sixteen, the world renowned Miami City Ballet hired ALICE to perform with the company as a member and she toured with the company while attending New World School for the Arts, winning the award for best ballet dancer. Then, at the age of seventeen, upon graduation from high school, ALICE was asked to represent the United States in the Ballet Olympics in Varna, Bulgaria and was the only female representative.

ALICE received the Outstanding Performance Award at the Olympics. Also at the age of seventeen, ALICE was offered and accepted a contract with the Sarasota Ballet of Florida and within six months was promoted to soloist. Sarasota Ballet sent ALICE to the New York International Ballet Competition; she performed as a finalist and placed fourth. At nineteen, ALICE was offered a principal contract by the Sarasota Ballet, but she decided to continue her career as a guest artist and accepted a contract with the San Francisco Ballet, the oldest and one of the most prestigious ballet companies in the United States. Right away, she was given principal roles to perform in famous ballets by Balanchine, Director James Kudelka of the National Ballet of Canada, Jerome Robbins and others. In 2001, ALICE's final performance from the San Francisco Ballet was at the Paris Opera and then she was offered a soloist position with the Royal Winnipeg. Rather than accepting this position, ALICE relocated to Los Angeles where she taught ballet and dance for the City of Beverly Hills and performed as a principal performer at the LA Weekly Awards. At this time, ALICE performed with the Ziggurat Theatre Company as a dancer and actress and accepted roles in various films. In July of 2003 MOVIN' OUT flew ALICE to New York City to audition for the company and they were impressed. Shortly thereafter, over thousands of applicants, she was offered and she accepted an original cast contract for the First National Tour of the Broadway Show MOVIN' OUT.  In sum, ALICE's adolescence, teenage and early years were dedicated to dance and, based on aptitude and hard work, she fast became one of the rising stars of her profession.

21. On December 15, 2003, Ms. ALYSE started rehearsals for MOVIN' OUT at the 42nd Street Studios on Broadway and began performing with the show when it opened in Detroit on January 27, 2004 at the Fox Theatre.

22. By July, 2004, impressed with her dancing skills, Defendants THARP, Director, Choreographer and Creator of the show and SPROSTY, the Production Stage Manager, told ALICE that she was to be scheduled to soon start rehearsals for learning a principal lead of the character "Judy" in the show and then later for the lead role of "Brenda." Reports from management and in her own observations TWYLA THARP personally praised Ms. ALYSE for her work in the show opening night in Los Angeles at the Pantages Theatre.

23. Because of the nature of the MOVIN' OUT Tour, which traveled from city to city, the cast and crew became very close; they were like a family, as everyone was constantly in close proximately, living, going to promotional events, eating and traveling together, in effect sharing in each other's experiences and lives. The need for harmony was thus great. However, despite management's showcasing her in the media, as well as praise from management, Ms. ALYSE was troubled by what she observed in the early months of her employment with MOVIN' OUT. She saw that Defendants THARP and SPROSTY, in particular, threatened to fire and did fire dancers because they were injured while dancing, through no fault of their own. Thus, dancers were coerced into dancing while hurt. In addition, other dancers were threatened for allegedly being overweight and having become more voluptuous and womanly, even though they were not overweight. It appeared to ALICE that there was pervasive harassment, sexual, ethnic and other forms of discrimination in the workplace and she, and others in the

8

cast, were fearful for their jobs. In short, a culture of fear and intimidation was present. No less than ten cast members and lower and middle level management were fired during ALICE's tenure and many were fired, forced out or quit around the time that ALICE was wrongfully terminated on February 17, 2006.

24.    In addition, despite the hands on approach of the Owners and management to the show, which was a smash hit and thus very lucrative, Ms. ALYSE observed a tolerance by the Owners and upper management to the pervasive, threatening behavior and harassment and sexual, ethnic and other forms of discrimination, as well as the use of foul and offensive language by Defendant SPROSTY, who oversaw and supervised the cast and lower to middle management. It appeared that he had a latent dislike and hostility toward women.  In short, perhaps because the show was so successful, Owners and management tolerated virtually all types of offensive behavior toward the cast and others. While Ms. ALYSE did not know it when hired by MOVIN' OUT, she later learned that men were paid more than women for the equivalent dancing roles which require equal skill, effort and responsibility and which are performed under similar working conditions.

24.    Ms. ALYSE observed that this culture of intimidation and fear had a purpose.  The purpose was to force dancers to perform while injured and to insure that they did not complain about it internally and to government authorities. In effect, the dancers in particular were treated like lesser human beings; they were to be seen and not heard and it was made clear that they virtually had to perform on command.

25.    On September 23, 2004, Ms. ALYSE was dancing at the Pantages Theatre in Los Angeles when she was dropped from a lift because her male dance

partner's hand was sweaty. Since her dance partner was six feet three inches tall, her fall was substantial. The accident injured the joint in her big right toe, which is crucial for a dancer. In effect, it is like a baseball pitcher injuring his throwing arm. The injury occurred in the second act toward the end of the show and in the middle of the stage. She reported the accident after the segment, but, despite her pleas, management did not get her a doctor to treat the injury for over a week and one half. Given the culture of intimidation and fear, Ms. ALYSE felt obligated and coerced to continue to dance her required shows during this time frame.

26.    When Ms. ALYSE finally was permitted to see a doctor, her big right toe was so swollen that examination merely showed a severe bruising of the two-seismoid bones under the joint of the big right toe. After she took leave to recuperate, Ms. ALYSE went to see a specialist orthopedic surgeon who injected her with cortisone to bring down the swelling. She had an MRI and, as a result, the specialist orthopedic surgeon, Dr. Eugene P. Toomey, was able to then see and thus uncover a fracture in the joint of the big right toe, in addition to the previously diagnosed bruising.

27.    As a result of the fall and injury, Ms. ALYSE was out from work from on or about September 23 through January 31, 2005. During this period, Ms. ALYSE maintained her conditioning but noticed that her breast size had naturally increased from size C to D. Her body was in a period of maturation and change. Wanting to return to the show without interruption, more than two weeks before Ms. ALYSE rejoined MOVIN' OUT, on several occasions she notified Defendant SPROSTY and other company management that her costumes would have to be altered to take into account her larger breast size.

28.    In addition to notifying management that her costumes would have to be altered, Ms. ALYSE made another phone call to SPROSTY and left a message on his voice mail requesting more time to recuperate, since while the big right toe was healing, her foot had lost some strength. Dr. Toomey had therefore instructed Ms. ALYSE to extend her return by another week. When SPROSTY heard the message and returned Ms. ALYSE's call, he began ranting and raving against her.   In threatening tones, he screamed that "his" schedule was now all screwed up and that he would now teach the lead role of Judy, which had been promised to Ms. ALYSE, to someone else. Despite SPROSTY's attempt to coerce Ms. ALYSE to return to the show while injured, against her doctor's advice, she was apologetic that she needed more time, but to no avail, and SPROSTY abruptly ended the phone call. Particularly in light of her experience observing how others in the cast had been treated while injured, Ms. ALYSE felt great anxiety and emotional distress and feared for her promised promotions and even her job.

29.    On Tuesday, February 1, 2005, when Ms. ALYSE returned to the tour in East Lansing, Michigan, she asked SPROSTY and others in management again to have a costume fitting, but SPROSTY refused. He told Ms. ALYSE that not until the next day, the day she was scheduled to perform, would she have the costume fitting. He assured Ms. ALYSE that everything would be fine, since the fitting was scheduled at 1:00 P.M. at the theatre and the show would not go on until 8:00 P.M. This would provide at least seven hours to make any alterations.

30.    On Wednesday, February 2, 2005, following Ms. ALYSE costume fitting, SPROSTY was notified by wardrobe personnel that Ms. ALYSE's costumes needed to

be altered in the breast area only. As Ms. ALYSE was walking out of wardrobe fitting room, the Assistant Company Manager John Gendron was sitting in the hallway. ALICE told him that her costumes did not fit in the breast area and he assured her that everything would be OK. At virtually the same time, SPROSTY came bolting out of the wardrobe fitting room and began ranting and raving and screaming. Coming toward Ms. ALYSE in a threatening manner, shaking and erratically moving his arms, he yelled, "YOUR BOOBS ARE FUCKING HUGE!" "WE HAVE TO CHANGE ALL OF YOUR COSTUMES!" Shocked and scared, and in fear of great bodily injury, and wanting to calm SPROSTY down, Ms. ALYSE replied that she had tried everything possible to lose weight in the breast area by exercising, to no avail. Nevertheless, in an heightened fit of rage, SPROSTY persisted. "WE HIRED YOU AT A SIZE C AND NOW YOU'RE A FUCKIN D!" "YOU HAVE TO LOSE THEM NOW!" He then moved into his office, which was dark and, without turning on the light, continued to rabidly rant and rave while Ms. ALYSE remained in the hallway terrified and shaken. Shocked and withdrawing under the stress, embarrassment and humiliation in front of John Gendron and others who overhead the threatening outbursts, Ms. ALYSE told SPROSTY again that she had tried everything she could to lose weight in her breasts but they had not gone down, and told him that the costumes fit fine everywhere else. In a continued rage, SPROSTY screamed, "I DON'T CARE! WE PROBABLY WILL NOT BE ABLE TO PUT YOU ON BECAUSE YOU HAVE NO COSTUMES! WE MIGHT HAVE TO FLY SOME COSTUMES IN FROM NEW YORK. YOU NEED TO LOSE THOSE BOOBS NOW!" Pushed beyond any limit and terrified that she would be fired then and there, as well as physically attacked by SPROSTY, Ms. ALYSE ran to her dressing room for refuge

where she uncontrollably broke down in tears in a state of near nervous breakdown. The dressing room was filled by all of Ms. ALYSE's female peers from the show, who tried to consol her. Ms. ALYSE was humiliated not only because of the issue of her breasts, but she continued to be fearful about what was going to happen next. Without knocking, SPROSTY barged into the dressing room and, in front of Ms. ALYSE's female co-workers, in a hostile and angry and loud voice stated, "I CAN'T PUT YOU ON TONIGHT, MAYBE FRIDAY!" He then abruptly walked out, as Ms. ALYSE continued sobbing. Ten to fifteen minutes after SPROSTY abruptly left the dressing room, Ms. ALYSE was called into the office of Diana Fairbanks, on information and belief at the urging of John Gendron, and Ms. Fairbanks closed the door as Ms. ALYSE was still crying. Ms. Fairbanks told Ms. ALYSE that John Gendron had told her everything and she tried to consol her as woman, stating, "I'm sorry you were treated that way." Ms. ALYSE's first reaction to Ms. Fairbank's statements was to ask if she could be fired. Ms. Fairbanks then told Ms. ALYSE that her job was secure and that she could not be fired. Ms. ALYSE, in front of John Gendron, then gave Ms. Fairbanks a full account of what had happened, still in tears and shaken up. In response, Ms. Fairbanks told Ms. ALYSE that after she learned of the incident from John Gendron, in the ten to fifteen minutes between the original outbursts and his entering the dressing room, she had confronted SPROSTY behind closed doors and told him that he could be sued for what he did and that he thus better apologize. She further told him that you can't treat people that way. Ms. Fairbanks then added that she would inform upper management, including but not limited to Defendants STRASSLER and THARP, of what had occurred. On information and belief, it is the job of STRASSLER and THARP to then inform the Owners.

13

31.    Shortly thereafter, the show was to begin and, one half to one hour before the show, Ms. ALYSE was approached by many of the cast members, crew and close professional friends and asked why she was not dressed and why she was not performing. Humiliated, stressed, beaten and with great sadness, Ms. ALYSE confided in her fellow co-workers about the incident and what had occurred. From this point forward, she felt psychologically damaged, violated and embarrassed about her breast size with not only the cast, but with the audience. In effect, she was made to feel freakish and like an outcast.

32.    Before the show began and after the incident, Diana Fairbanks approached ALICE backstage and seeing the anxiety in her face, Diana Fairbanks assured her that she personally would do everything possible to protect Ms. ALYSE. Ms. Fairbanks then said, "Off the record, you should file the incident with the union if you feel comfortable." She added that she could not officially counsel this because of her management position with MOVIN' OUT, implying that this presented a conflict of interest.

33.    SPROSTY pulled Ms. ALYSE into a room in the theatre with no one else present and disingenuously apologized in a halfhearted way. However, undaunted, and not being able to quit, he persisted, "WHY ARE YOUR BOOBS BIGGER? DID YOU START BIRTH CONTROL PILLS? DID YOU DO SOMETHING TO MAKE YOUR BOOBS BIGGER?" While feeling violated and her privacy invaded, Ms. ALYSE responded "no," that she did not do anything abnormal and that her breasts are real.

34.  Ms. ALYSE had a feeling of anxiety, shock, humiliation, hurt and emotional distress, and she thus felt compelled to write a letter describing the incident to her union and upper management.

35.  On February 8, 2005, ALICE e-mailed a letter to Defendant STRASSLER and her union Actors' Equity Association complaining of the incident. On information and belief, STRASSLER informed THARP and the Owners of what had transpired.

36.  On February 8, 2005 at 4:23 p.m., STRASSLER, in fact, sent a letter/e-mail to ALICE confirming her knowledge that the sexual harassment and other misconduct actually occurred.  STRASSLER even tried to defend defendant SPROSTY by praising him and incredulously blaming his misconduct on quitting smoking. STRASSLER then conceded that the MOVIN' OUT show is a constant "nightmare".

37.  A while later both Diana Fairbanks and John Gendron were removed from their management positions on the MOVIN' OUT Tour.

38.  Despite complaints of a hostile workplace environment and ongoing sexual harassment and sexual and ethnic discrimination to ACTORS' EQUITY ASSOCIATION and Ms. ALYSE's employer, MOVIN' OUT, nothing was submitted by either party to the Grievance Committee pursuant to Rule 4 of the CBA.  No attempt was made to contact the Plaintiff regarding her well-documented concerns about the hostile workplace environment, and a grievance procedure was not commenced pursuant to Rule 4.  Rule 4, titled "Arbitration and Grievance," provides:

> **"Except as otherwise expressly provided in these Rules, any dispute between a Producer and/or the League and the Actor and/or Equity relating to the interpretation or application of the Collective Bargaining Agreement between Equity and the League shall be submitted to the Grievance Committee at the request of either Equity, the Producer, or the League, and if not decided by the Grievance Committee, may be submitted to arbitration**

**as provided below.  If a dispute or grievance relates to a production with a Point of Organization other than New York, Equity shall have the right to demand arbitration of the grievance or dispute without prior resort to the Grievance Committee."**

39.     The pervasive work place environment of sexual and ethnic harassment and intimidation continued, with SPROSTY and others making sexual statements and advances without any limits. For instance, SPROSTY would frequently make unwanted references to Ms. ALYSE about his exploits with lovers and how he would give them blow jobs in public rest rooms. On other occasions, managers were allowed to make sexual advances toward Ms. ALYSE, without any restriction or reprimand. And if this was not bad enough, then Ms. ALYSE was required to undress each evening, while performing costume changes, out in  open areas, where even the audience could see her naked, off stage. Stage crew in each city, not connected with the show, gazed upon her, as well as members of the show, including but not limited to SPROSTY, thereby increasing her anxiety and emotional distress. When Ms. ALYSE asked that this stop, SPROSTY dragged his feet in correcting this offensive and violative workplace environment. In addition, because of SPROSTY's attacks on Ms. ALYSE's breasts, they became the subject of jokes and ridicule, with some male dancers grabbing her breasts during performances, thinking this was funny, or for whatever other inappropriate reason. This caused Ms. ALYSE great anxiety, depression and fear in performing before audiences, and generally, as she was continuously subject to this behavior.

40.     While emotionally distressed and physically harmed, with great difficulty Ms. ALYSE continued to perform in the show, careful to not re-injure her joint in the big right toe as it was still healing.

41.    One and one half months later, while performing at a theatre in Des Moines, Iowa, the prior injury to Ms. ALYSE's big right toe joint was compounded when a male dancing partner with combat boots kicked her during an acting scene at the beginning of the second act.   Ms. ALYSE quickly informed management of the compounded "reinjury" when she got off stage; however, given the culture of intimidation and fear she felt compelled if not coerced to finish the show.  The next day Ms. ALYSE was in excruciating pain and her big right toe was swollen to the point where there was no movement.

42.    The next stop for MOVIN' OUT was Nashville, Tennessee, where Ms. ALYSE visited a doctor for her compounded injury.  The doctor took x-rays and found cartilage damage and micro-fractures within the joint. Ms. ALYSE was placed in a medical boot and the company asked her to leave the Tour and recover.  Ms. ALYSE again saw specialist Dr. Eugene P. Toomey to follow up with care for her injured big right toe joint.    In Nashville, Ms. ALYSE contacted MOVIN' OUT's workers' compensation insurance carrier, Defendant LIBERTY MUTUAL, and notified her given adjuster, Lori Sabin, of the injury.

43.    Ms. ALYSE took the necessary healing treatments prescribed by Dr. Toomey. Ms. ALYSE researched and found a physical therapy specialist in the dance and sports fields.  On this and several other occasions, Ms. ALYSE spent her own money to make sure that she timely received the appropriate care, so she could return to the show as quickly as possible.

44.    Later, early on in her recovery period, in another act of retaliation, SPROSTY shipped to Ms. ALYSE in Seattle all of her work related items, such as

makeup, warm up clothes, dance shoes, and other items needed to dance in the show, as a way to intimidate, emotionally harm, and coerce Ms. ALYSE to now leave the show, as she had become an outcast and expendable. This was despite the fact that ALICE was confident of her ability to return to MOVIN' OUT and thus there was no need to ship her workplace items to her in Seattle. Indeed, it likely cost MOVIN' OUT more to ship Ms. ALYSE's workplace items to Seattle than it would have cost to transport them with the show during the anticipated period of Ms. ALYSE's recovery.

45.    On July 5, 2005, after most of the swelling had subsided and Dr. Toomey's had taken and examined an MRI, he informed her that she needed surgery. However, before considering whether or not to authorize surgery, Defendant LIBERTY MUTUAL directed Ms. ALYSE to get a second opinion. Adjuster Lori Sabin assured Ms. ALYSE that after she obtained a second opinion, that there would be no problem getting the necessary surgery. From August 2005, to September 15, 2005, Ms. ALYSE diligently tried to set up appointments with a suitable specialist. After finding and being referred to Dr. Mann, in San Francisco, Defendant LIBERTY MUTUAL dragged their feet on calling Dr. Mann's office, creating a  back and forth effect, thereby delaying her care.  However, despite Ms. ALYSE's efforts to identify a specialist who could give a reasoned second opinion, Defendant LIBERTY MUTUAL denied payment for authorized second opinion, thereby delaying Ms. ALYSE's care and rehabilitation. LIBERTY MUTUAL refused payment allegedly because it cost too much. Becoming frantic, Ms. ALYSE tried to reach Defendant LIBERTY MUTUAL's adjuster, Lori Sabin, leaving several messages and also trying to find another specialist that would not be rejected by

18

the insurance carrier. As a result, Ms. ALYSE returned home to Miami and sought a specialist there.

46.    In Miami, Ms. ALYSE located a specialist, Dr. Thomas P. SanGiovanni, who is the physican of the Miami City Ballet.  She was then informed by Defendant LIBERTY MUTUAL that its adjuster, Lori Sabin, had been "promoted" and that a new adjuster, Mark Ellinwood, has been assigned to her case. Mr. Ellinwood then authorized the second opinion by Dr. SanGiovanni. After his examination of Ms. ALYSE on October 7, 2005, he too recommended surgery. Ms. ALYSE then informed adjuster Ellinwood that she needed to have the surgery with Dr. Toomey immediately, because she feared losing her job if she did not return to the show by March 12, 2005. Adjuster Ellinwood then informed Defendant LIBERTY MUTUAL that Ms. ALYSE needed surgery and, within a few days, he told her that his company now wanted to have the medical records reviewed by the carrier's in house doctor and then an "independent evaluation" made by an outside physician of LIBERTY MUTUAL, Dr. Purita of Boca Raton. Stressed and tearful, Ms. ALYSE explained to adjuster Ellinwood that previous adjuster Lori Sabin had promised prompt treatment following the second opinion, but Ellinwood was told by Lori Sabin that she had nothing further to do with Ms. ALYSE's case and that she had been transferred to a different department and promoted.  Frantic at what appeared to be intentional delay and recklessness and lack of  timely action by Defendant LIBERTY MUTUAL, which was acting in concert with  MOVIN' OUT and the other Defendants, Ms. ALYSE called Defendant STRASSLER of MOVIN' OUT and complained. In response, Defendant STRASSLER threatened not to extend the cut off date of March 12, 2005, for Ms. ALYSE to return to the show.

47.   The March 12, 2005, cut off date represented the one-year anniversary of Ms. ALYSE's second injury. Under her contract and the CBA, MOVIN' OUT had and has the discretion to in effect extend the recuperation period, but Defendant STRASSLER refused and failed to acknowledge this during her conversation with Ms. ALYSE. On information and belief, STRASSLER, in conjunction with the other Defendants, wanted the deadline to run to later provide an excuse, however illegitimate, to fire Ms. ALYSE in retaliation for her having raised issues concerning the misconduct of Defendant SPROSTY, to further the culture of intimidation and fear where dancers are to be seen and not heard.

48.   Taking no action to timely have Ms. ALYSE get her operation, to the contrary and on information and belief at the direction of the other Defendants, Defendant LIBERTY MUTUAL stopped her weekly injury compensation payments, without cause. By this time, adjuster Ellinwood had been inexplicably removed from the case and a new adjuster assigned, Vicki Cangello, by now the third in a series of adjusters, further delaying Ms. ALYSE's surgery. When Ms. ALYSE contacted Ms. Cangello, she falsely claimed that the reason for the cancellation of weekly injury compensation payment was because Ms. ALYSE had not seen a doctor within the last forty-five days. In fact, Ms. Cangello and LIBERTY MUTUAL lied, since ALICE had seen the doctor that Defendant LIBERTY MUTUAL had authorized, Dr. SanGiovanni, within the last fifteen days, or on the date of October 7, 2005. In addition to this falsehood, Ms. Cangello then claimed to have lost Ms. ALYSE's medical records that had been provided directly by Dr. SanGiovanni to Defendant LIBERTY MUTUAL. This added to Ms. ALYSE's severe emotional distress and significantly delayed her operation.

49.     Then, to add insult to injury, from early October through November 2005, Defendant LIBERTY MUTUAL failed to set up a timely appointment even with its so-called independent examining doctor, Dr. Purita, scheduling the appointment for early December 2005.   It was not until Ms. ALYSE's personal counsel stepped in and pressured Defendant LIBERTY MUTUAL, under threat of taking legal action, to comply with its duties, that an appointment with Dr. Purita was pushed up. In fact, Ms. Cangello lied and said that their were no appointments available soon with Dr. Purita when in fact there were appointments even as soon as that same day.   During counsel's discussions with Ms. Cangello of LIBERTY MUTUAL, she made several disparaging and negative remarks about Ms. ALYSE and dismissed the importance of her having an operation timely, saying that Ms. ALYSE would receive no special consideration, failing to take into account that her injury prevented her continuing with her career as a world class dancer and that she had a deadline to return to work at MOVIN' OUT. The conversation demonstrated animus and intent to severely harm Ms. ALYSE. Predictably, Dr. Purita concurred that Ms. ALYSE needed the operation, but not until after many weeks had needlessly been lost.

50.     Even after Dr. Purita's issued his concurring independent evaluation, it took Defendant LIBERTY MUTUAL another nine days to authorize the needed operation. Upon so doing, Ms. ALYSE moved immediately to schedule the operation with Dr. Toomey in Seattle and advanced her own monies to travel there, as she had done before, for the operation on December 14, 2005.

51.     Despite repeated requests by Ms. ALYSE to MOVIN' OUT's management to use its authority and power to make sure that Defendant LIBERTY MUTUAL

accelerated the claims process, Defendant STRASSLER and the other Defendants did not lift a hand and, on information and belief, actually encouraged its carrier to do little to nothing and in fact be obstructionist for many months.

52.   On December 14, 2005, ALICE had her long awaited operation. It was a success and she returned to her home in Miami for rehabilitative medical care and therapy. Her plan remained to return to MOVIN' OUT by March 12, 2005. However, because of the delay caused by Defendant LIBERTY MUTUAL and the other Defendants it became apparent to her Miami physician, Dr. SanGiovanni, that while she could return to the show at full capacity on or before that date, that it would not be prudent to do so, as a "premature" return could risk a career ending injury. Nevertheless, Ms. ALYSE was determined to return by that date out of fear that she would be terminated if she did not.

53.   During the course of Ms. ALYSE's therapy and rehabilitation in Miami, fortuitously the MOVIN' OUT Tour played in Florida, including Palm Beach, Ft. Lauderdale, Tampa-St. Petersburg, and Miami. Anxious and happy to visit with her colleagues, who she was looking forward to rejoining on tour in the near future, Ms. ALYSE made plans to attend the opening night performance at the Jackie Gleason Theatre on Miami Beach on the evening of January 24, 2006.

54.   However, when Ms. ALYSE arrived at the theater she was effectively excluded from going backstage to visit her fellow cast members to wish them luck before the show and others by company management, including but not limited to SPROSTY. And, while other members of the cast were able to invite friends to the performance with free tickets, Ms. ALYSE's friends were only able to see the show if

they purchased their own tickets. When Ms. ALYSE was finally able to visit with her fellow cast mates she learned that the hostile work place environment she had been subjected to while dancing had not subsided and that SPROSTY, with the apparent consent of management, continued to do everything in its power to prevent her return to the show. For instance, from no less than four members of the cast, Ms. ALYSE learned that evening that SPROSTY had told them during the Florida tour that he "WOULD DO EVERYTHING POSSIBLE TO PREVENT ALICE FROM RETURNING TO THE SHOW." He added, "I DON'T WANT HER BACK!" For apparent good measure, he also called her a liar and impugned her professional integrity by stating that "ALICE IS FAKING HER INJURY AND TAKING HER OWN SWEET TIME TO COME BACK." Further, in creating a "catch 22" that would prevent Ms. ALYSE's return to the show, he also remarked to the cast that he would create three hoops, in effect, that she would have to jump through for her return; first that she would have to "JUMP INTO THE SHOW WITHOUT THE BENEFIT OF ANY REHEARSAL," second, as occurred during the earlier sexual and ethic harassment episodes, "THAT SHE WOULD HAVE TO FIT INTO HER COSTUMES WITHOUT ANY ALTERATIONS," thereby upping the ante of harassment a step further, and third, that he would "FIRE HER IF SHE IS ANYTHING LESS THAN ONE HUNDRED PERCENT EVEN DURING HER FIRST PERFORMANCE AFTER COMING BACK." Obviously, these non-sensical and impossible conditions were designed to have Ms. ALYSE fired even were she able to return to the show on March 12, 2006.

55.    Upon hearing that SPROSTY had said these things to the cast, Ms. ALYSE became more emotionally distressed and broke down in tears, with the even more heightened depression continuing to the present.

56.    Commencing the following day, January 25, 2006, Plaintiff Ms. ALYSE and her counsel were involved in a series of correspondence with STRASSLER of Movin' Out and ACTORS' EQUITY ASSOCIATION.    Specifically, Ms. ALYSE complained about the conduct of SPROSTY and requested that it be addressed prior to her anticipated return to the show.

57.    In the letter, Ms. ALYSE put STRASSLER on notice of what SPROSTY had told the cast. She asked for STRASSLER's help and expressed her continuing desire and intent to return to the show. She requested that the management and owners control SPROSTY when she returned to the show.

58.    Rather than addressing Ms. ALYSE's severe emotional and physical distress and other complaints, on January 26, 2006, STRASSLER wrote back threatening Ms. ALYSE that if she did not return to the show by March 14, 2006, that she would be fired.

59.    STRASSLER concluded her letter by stating, "These are the only issues on the table," totally ignoring the issues of the sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment created and perpetuated by SPROSTY, management and the owner partners of MOVIN' OUT and ACTORS' EQUITY ASSOCIATION through their actions and inactions.

60.    On January 30, 2006, Ms. ALYSE, through counsel, wrote to STRASSLER and copied ACTORS' EQUITY ASSOCIATION with a letter which

comprised all of Ms. ALYSE's complaints to date. Attached was a medical evaluation of Dr. San Giovanni, formally stating that while she could return to the show by March 14, 2006, at full capacity, an additional 10-12 weeks would be prudent to prevent a possible career ending injury. The letter incorporated all of Ms. ALYSE's hostile workplace environment, sexual harassment and sexual and ethnic discrimination complaints and further requested that MOVIN' OUT's management provide safeguards that once Ms. ALYSE returned to the show that the offending and pervasive hostile work place environment cease.

61.    While the Union did support an additional ten to twelve week recuperation period, it refused to address the serious sexual harassment, sexual and ethnic discrimination, hostile workplace and mistreatment complaints set forth in the letter. The Union took no action on behalf of Ms. ALYSE even though it was fully apprised of the climate of the show and the abuse to which Ms. ALYSE was subjected.

62.    Instead of granting a prudent period of eight to ten weeks to return to the show, MOVIN' OUT, through counsel, and in an act of retaliation for raising the harassment issue again, told Ms. ALYSE in a letter of February 9, 2006, that her return to the show was conditioned on her signing a release exonerating defendants from all liability for the harassment and other tortious acts and her agreeing to return to the show only after October 3, 2006. The letter was copied to ACTORS' EQUITY ASSOCIATION demonstrating, once again, that the Union was not only blind but inert to the unfortunate events occurring at that time. It also shows that the Union was complicit and had agreed to MOVIN' OUT's demands, as this strategy had, on information and belief, been formulated jointly during closed door secret meetings between

25

representatives of the Union and MOVIN' OUT. Indeed, in later telephone conversations between counsel for Plaintiff Ms. ALYSE and Ken Greenwood, Ms. AYLSE's union representative, Greenwood urged Ms. ALYSE to accept these terms and described them as a "good deal."

63. The reason for the later return to work date, not requested by Ms. ALYSE, was to retaliate against Ms. ALYSE for speaking up, since this would mean that she could not draw her full salary and other benefits for almost ten more months and could return to the show only after it had traveled to Japan, Hawaii and other desirous locations, a clear punishment since management knew that Ms. ALYSE was looking forward to performing in these venues.

64. The action taken by MOVIN' OUT and the Union's acquiescence is improper under the Actors' Equity Association rules as no written request to the ACTORS' EQUITY ASSOCIATION was made requesting a member to sign a release. Rule 13 of the collective bargaining agreement states,

> "**Waiver or release not permissible.** Upon any claim of the Actor arising under Actor's agreement through any beach thereof, no receipt, waiver, release or adjustment by the Actor is of any validity whatsoever unless Equity consents in writing. The Producer, by agreeing to this rule, agrees that Producer will not seek or solicit any such waiver, release or settlement, nor offer the same in any arbitration or any proceeding in court unless Equity specifically consents thereto in writing."

65. On February 10, 2006, Ms. ALYSE, through counsel, wrote back to the show's management, through its counsel and to ACTORS' EQUITY ASSOCIATION, stating, "Your client's ... proposal is non-sensical and retaliatory. It is part and parcel to the way she has been treated throughout this sad ordeal. ... It is obvious that the October 3, 2006, date is only intended to deny her the opportunity to rejoin the show

before it travels to Japan, Hawaii and other desirable locations and thus constitutes further retaliation intended to maliciously harm her by, in effect, "teaching her a lesson" to never again speak up about work place and other harassment and misconduct by SPROSTY and others. ... Your client's demand that she either accepts the October 3, 2006, return date or be denied return to the show is designed to increase her emotional distress and prolong her financial burden and to coerce her into a settlement on your client's terms. This considerably compounds the damage to Ms. Alyse and evidences further bad faith. ... During our conversation yesterday, you effectively called Ms. Alyse a liar and denied that SPROSTY had harassed her. These denials are less than credible and false, particularly since your own client has admitted to the misconduct of Mr. SPROSTY. See exhibit 1."

66.    After receipt of the correspondence, ACTORS' EQUITY ASSOCIATION failed to take any action on Ms. ALYSE's behalf and did not attempt to contact Ms. ALYSE and did not file a complaint with the Grievance Committee.  Instead of taking action on behalf of its member, ACTORS' EQUITY ASSOCIATION continued to hold secret improper closed door meetings with MOVIN' OUT during which, on information and belief, the Union conspired with MOVIN' OUT on ways to deny Ms. ALYSE her rights and harm her.  After the meeting, ACTORS' EQUITY ASSOCIATION refrained from taking and refused to take any action on behalf of Ms. ALYSE with regard to her harassment and employment discrimination claims.

67.    When Plaintiff's counsel then called Ken Greenwood, Ms. ALYSE's Union representative, Greenwood, in derogatory and snide tones, made statements disparaging Ms. ALYSE, stating that she was a "problem," and urged Ms. ALYSE to

sign the release despite the fact proper internal Union procedures were abandoned in terms of the issuance of a request to sign release in the first place.  Greenwood further represented that no one would testify or corroborate Ms. ALYSE's story and that SPROSTY was a prominent member of the Union.   Mr. Greenwood admitted that he had a conflict on his hands, since the Union represented both SPROSTY and Ms. ALYSE.

68.     On February 10, 2006, Ms. ALYSE, through counsel, wrote back stating that she would return to work on June 5, 2006, but would not sign a release.

69.     MOVIN' OUT then terminated Ms. ALYSE's employment on or about February 10, 2006 as evidence by various correspondence and later in a letter dated February 17, 2006.

70.     This act constituted further retaliation against her for having spoken up about the pervasive hostile work place environment at MOVIN' OUT and the other torts committed against her and others in the cast. It was also intended to send an additional message to others not to do as Ms. ALYSE has done; stand up for her rights in the face of the show's culture of intimidation and fear leveled against its dancer actors in particular. Around the time that Ms. ALYSE was wrongfully terminated, two of her closest friends in the show, sympathetic to her condition and plight, were also fired, in further acts of retaliation and employment discrimination.  It is apparent from the timing of these and other firings that MOVIN' OUT and the other Defendants not only sought to retaliate and discriminate against Ms. ALYSE and her friends in the show, and prevent them from banding together to collectively assert their rights, but also to send a strong message that dancers and others were not to be permitted to speak their mind and

stand up for their rights. To drive this point home, many of these firings occurred when the employees had just purchased a home or were expecting a child. Defendants' maliciousness toward their employees is part and parcel to the pervasive hostile workplace environment they created and furthered.

71.     ALICE's wrongful termination on or about February 10, 2006, occurred before the March 14, 2006, date, which even Defendants had admitted was the deadline for her to return. It was thus premature even under their disingenuous reasoning and constituted further retaliation against ALICE. In addition, before this deadline ran, Defendants hired, full time, a replacement for ALICE, who is white and anglo. Importantly, ALICE and one of her friends in the cast, who had also been recently fired, are Hispanic. This was part of a pattern of discrimination by Defendants against persons of Hispanic dissent. Indeed, SPROSTY would frequently roll his eyes when observing ALICE and her friend speaking Spanish. Like ALICE, on several occasions her Hispanic friend was also harassed by SPROSTY for her breast size in her dressing room. ALICE's friend has since left the show, after she learned that an anglo male dancer was being paid more than her for the equivalent position.

72.     After Ms. ALYSE's wrongful termination, ACTORS' EQUITY ASSOCIATION again failed and refused to take any action to have her reinstated.   Ms. ALYSE continues to pay her dues; however, the last time she called the Union, it refused to speak to her, let alone take any action to reinstate her employment or hold the show accountable for the Union rules and regulations and federal and state laws that were violated.

73.   On March 15, 2006, Plaintiff, through counsel, wrote to her union

representative, Ken Greenwood.

The letter states:

March 15, 2006

*Via Facsimile: (212) 719-9815
& U.S. Mail*

Ken Greenwood, Esq.
Actors' Equity Association
165 West 46th Street
New York, New York 10036

   **Re:** **Alice Alyse**

Dear Mr. Greenwood:

During the weeks that preceded the firing of my client, Alice Alyse, it became apparent to my client and me that you were taking the side of Movin' Out and not a union member.

Today, I learned that you killed a New York Times story about the pervasively hostile workplace environment at Movin' Out.

As troubling, in reviewing Equity rules the other night, I came upon Rule 13, which provides:

(A) *"Waiver or release not permissible. Upon any claim of the Actor's agreement through any breach thereof, no receipt, waiver, release, or adjustment by the Actor is of any validity whatsoever unless Equity consents in writing.*
*The Producer, by agreeing to this rule, agrees that Producer will not seek or solicit any such waiver, release, or unless Equity specifically consents thereto in writing. "*

Please advise how your advocating that Alice sign the release absolving Movin' Out and its agents from all liability for sexual harassment and gender and ethnic based discrimination squares with this Rule?

74.     On behalf of the Union, Mr. Greenwood responded in writing to the

letter on March 16, 2006 as follows:

Dear Mr. Klayman,

With respect to your fax to me dated March 15, 2006, please be
advised that it has been referred to our outside legal counsel, Frank Moss, Esq.
who will respond to you in due course.
In the event you wish to contact Mr. Moss directly, his contact
information is as follows:

Email: fmoss@spivak-liton.com
Phone: 212-765-2100

Very truly yours,


Kenneth Greenwood
Senior Business Representative
Actors' Equity Association


75.     Predictably, over three months later, Mr. Moss has not responded to

Plaintiff Ms. ALYSE.  Greenwood, Moss and the Union have effectively told Plaintiff Ms.

ALYSE that she is not to communicate further with the Union, and indeed the Union has

failed to take her telephone calls. The Union not only failed to fairly represent Plaintiff,

Ms. ALYSE, it did not represent her at all and is completely hostile and adverse.

76.     Mr. Greenwood's refusal to communicate with the Plaintiff or her attorney

demonstrates the Union's complete abandonment, hostility and adversity to Ms.

ALYSE's complaints about sexual harassment, sexual and ethnic discrimination and

other unfair labor practices.

77.     Throughout the period of Ms. ALYSE's convalescence and rehabilitation

from her injuries, Defendants never once tried to make a reasonable accommodation for

her disability, including but not limited to undertaking job restructuring, modifying work schedules, providing additional unpaid leave, reassigning her to a vacant position, or adjusting or modifying examinations, to allow her to return to work. Instead, they continued to harass and intimidate her, all with the design and purpose of driving her from the show. This caused both increased psychological and physical injuries to her.

78.    After Ms. ALYSE was wrongfully terminated by Defendants, members of the cast were falsely told that she could not return to work because of her injury. These statements by Defendants were untrue, as set forth in the medical evaluations of Ms. ALYSE's doctors, to which Defendants were privy. These false statements caused great emotional distress, loss of reputation, physical pain and suffering and other damage to Ms. ALYSE.

79.    Before working for Defendants, Ms. ALYSE never had a major injury, had never been fired and had never experienced workplace misconduct as set forth herein and thus never felt compelled to file suit.

80.    Following Ms. ALYSE's termination, Defendants caused her further pain and emotional distress in ways which include but are not limited to: a.) causing her to have premature and unnecessary independent medical examinations (IME's); b.) threatening her and her physical therapist to cut off her rehabilitative therapy and actually cutting off this therapy for a period of time; c.) making false and misleading representations to the New York Times and; d) other acts to be discovered in discovery.

**COUNT I:  BREACH OF DUTY OF FAIR REPRESENTATION AGAINST ACTORS'**

**EQUITY ASSOCIATION**

81.    Plaintiff realleges and reavers paragraphs 1 through 80 of the Complaint, as if fully stated herein.

82.    ACTORS EQUITY ASSOCIATION is the sole and exclusive bargaining agent for Ms. ALYSE, and she may not negotiate with MOVIN' OUT directly.   By assuming the exclusive authority to act for Plaintiff Ms. ALYSE, Defendant ACTORS' EQUITY ASSOCIATION assumed a legal duty and responsibility to represent Ms. ALYSE's interests fairly and equitably.

83.    ACTORS' EQUITY ASSOCIATION had a further responsibility to prevent invalid and arbitrary distinctions from being created among its members.

84.    By the acts and conduct set forth above, Defendant ACTORS' EQUITY ASSOCIATION has violated its duty of fair representation toward Plaintiff Ms. ALYSE as a member of the bargaining unit for which it served as exclusive bargaining representative by:

a.    failing to address the serious sexual harassment, sexual and ethnic discrimination, hostile workplace and unfair labor practice complaints raised by the Plaintiff;

b.    failing to pursue and lodge Plaintiff's complaints with the Grievance and/or Arbitration Committee;

c.    failing to provide the Plaintiff with a fair and impartial grievance hearing and affording her an unbiased hearing panel or arbitration;

d.    intentionally and with malice refusing to communicate with the Plaintiff or her attorney;

e.    intentionally and with malice abandoning  Ms. ALYSE's

legitimate complaints of sexual harassment, sexual and ethnic discrimination and other unfair labor practices after being fully apprised and informed of the hostile workplace environment to which the Plaintiff was subjected;

       f.    failing to take nay action on behalf of Plaintiff ALYSE for workplace retaliation by the MOVIN' OUT Defendants.

       g.    failing to take any action to have the Plaintiff's employment reinstated after she was wrongfully retaliated against and terminated, and

       h.    failing to hold the MOVIN' OUT Defendants accountable for the violating Union rules and regulations and federal and state laws.

85.    The Union's non-existent preparation, investigation and handling of ALYSE's grievances were not only intentional, but also inept, capricious, careless and corrupt in violation of its duty of fair representation.

86.    Defendant corruptly engaged in these acts and conduct against the Plaintiff in bad faith, and did so as part of its conspiracy with the MOVIN' OUT Defendants, with malice and/or with reckless indifference to Plaintiff's rights to have her grievances fairly and objectively processed by her exclusive bargaining representative, which instead acted out of bad faith and retaliation.

87.    ACTORS' EQUITY ASSOCIATION intended to and did cause harm to the Plaintiff.

88.    ACTORS' EQUITY ASSOCIATION's conduct prejudiced the Plaintiff's interests.  As a direct result of Defendants' above-described acts and conduct, Plaintiff has suffered and continues to suffer pecuniary and non-pecuniary losses, including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life,

negative physical side effects and other non-pecuniary losses in excess of $10,000,000.00.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, and award of attorneys' fees and costs, in excess of $50,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT II:  TITLE VII, 42 U.S.C. SEC. 2000e-(3)(a), WORKPLACE RETALIATION DISCRIMINATION ON THE BASIS OF SEX AND NATIONAL ORIGIN AGAINST MOVIN' OUT DEFENDANTS AND ACTORS' EQUITY ASSOCIATION

89.    Plaintiff realleges and reavers paragraphs 1 through 88 of the Complaint, as if fully stated herein.

90.    The MOVIN' OUT Defendants violated 42 U.S.C. Section 2000e-(3)(a) and committed unlawful retaliation and employment practices by discriminating against the Plaintiff, Ms. ALYSE, on the basis of sex and national origin because she made charges of unlawful conduct on the part the Defendants.

91.    The unlawful and discriminatory conduct committed by the MOVIN' OUT Defendants in retaliation of the Plaintiff includes but is not limited to:

a.    refusing and failing to acknowledge its discretionary authority to extend the Plaintiff's recuperation period in an effort to exhaust the deadline to later provide an excuse to fire Ms. ALYSE in retaliation for her having raised issues concerning the misconduct of SPROSTY;

b.    failing to take any action or addressing the conduct of SPROSTY that Ms. ALYSE complained of and requested be addressed prior to her anticipated return to the show;

c.      failing to take any action or addressing the sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment created and perpetuated by SPROSTY, management and the owner partners of MOVIN' OUT;

d.      conditioning the Plaintiff's return to the show upon her signing a release exonerating the MOVIN' OUT Defendants from all liability for the harassment and other tortious acts;

e.      conditioning the Plaintiff's return to the show upon her agreement to return only after the extended October 3, 2006 deadline to prevent her from drawing a full salary and other benefits for almost ten more months and  traveling to Japan, Hawaii and other desirous locations, a clear punishment since management knew that Ms. ALYSE was looking forward to performing in these venues;

f.      wrongfully terminating the Plaintiff in retaliation for her complaints of sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment.

92.      Defendant ACTORS' EQUITY ASSOCIATION violated 42 U.S.C. Section 2000e-(3)(a) and committed unlawful retaliation and employment practices by discriminating against the Plaintiff, Ms. ALYSE, on the basis of sex and national origin because she made charges of unlawful conduct on the part the MOVIN' OUT Defendants.

93.      The unlawful and discriminatory conduct committed by ACTORS' EQUITY ASSOCIATION in retaliation of the Plaintiff includes but is not limited to:

a.      refusing to address and taking no action of behalf of Ms. ALYSE regarding the serious sexual harassment, sexual and ethnic discrimination, hostile workplace and mistreatment complaints set forth in numerous phone calls and correspondence directed to the Union;

b.      acquiescing in conditioning the Plaintiff's return to the show only upon the Plaintiff executing a release exonerating defendants from all liability for the harassment and other tortious acts without following proper Union procedures;

c.      acquiescing in conditioning the Plaintiff's return to the show only after October 3, 2006. and agreeing to MOVIN' OUT's demands, formulated jointly during closed door secret meetings between representatives of the Union and MOVIN' OUT;

d.       making material misrepresentations to the Plaintiff Ms. ALYSE that the terms and conditions of demanded by MOVIN' OUT regarding the Plaintiff's return to the show were a "good deal";

e.      failing and refusing to take any action to have the Plaintiff's employment reinstated after Ms. ALYSE's wrongful termination;

f.      failing and refusing to hold the MOVIN' OUT accountable for the Union rules and regulations and federal and state laws that it violated; .

g.      refusing to communicate with the Plaintiff or her attorney due to Ms. ALYSE's complaints about sexual harassment, sexual and ethnic discrimination and other unfair labor practices.

94.     The foregoing allegations constitute violation of 42 U.S.C. Section 2000e-(3)(a) by the MOVIN' OUT Defendants and ACTORS' EQUITY ASSOCIATION, jointly and severally.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT III:  TITLE VII, 42 U.S.C. SEC. 2000e-(2)(a), WRONGFUL TERMINATION ON THE BASIS OF SEX AND NATIONAL ORIGIN AGAINST MOVIN' OUT DEFENDANTS AND ACTORS' EQUITY ASSOCIATION

95.     Plaintiff realleges and reavers paragraphs 1 through 94 of the Complaint, as if fully stated herein.

96.     The MOVIN' OUT Defendants violated 42 U.S.C. Section 2000e-(2)(a) by discharging the Plaintiff's employment and otherwise discriminating against her with respect to her terms, conditions and privileges of her employment because of her sex and national origin.

97.     The unlawful and discriminatory conduct committed by the MOVIN' OUT Defendants includes but is not limited to:

a.     refusing and failing to acknowledge its discretionary authority to extend the Plaintiff's recuperation period in an effort to exhaust the deadline to later provide an excuse to fire Ms. ALYSE for her having raised issues concerning the misconduct of SPROSTY;

b.      failing to take any action or addressing the conduct of SPROSTY that Ms. ALYSE complained of and requested be addressed prior to her anticipated return to the show;

c.      failing to take any action or addressing the sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment created and perpetuated by SPROSTY, management and the owner partners of MOVIN' OUT;

d.      conditioning the Plaintiff's return to the show upon her signing a release exonerating defendants from all liability for the harassment and other tortious acts;

e.      conditioning the Plaintiff's return to the show upon her agreement to return only after the extended October 3, 2006 deadline to prevent her from drawing a full salary and other benefits for almost ten more months and  traveling to Japan, Hawaii and other desirous locations,

f.      wrongfully terminating the Plaintiff in retaliation for her complaints of sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment.

98.    ACTORS' EQUITY ASSOCIATION violated 42 U.S.C. Section 2000e-(2)(a) by acquiescing in discharge of the Plaintiff's employment and otherwise discriminating against her with respect to her terms, conditions and privileges of her employment because of her sex and national origin.

99.    The unlawful and discriminatory conduct committed by ACTORS' EQUITY ASSOCIATION includes but is not limited to:

a.      refusing to address and taking no action of behalf of Ms. ALYSE regarding the serious sexual harassment, sexual and ethnic discrimination, hostile workplace and mistreatment complaints set forth in numerous phone calls and correspondence directed to the Union;

b.      acquiescing in conditioning the Plaintiff's return to the show only upon the Plaintiff executing a release exonerating defendants from all liability for the harassment and other tortious acts without following proper Union procedures;

c.      acquiescing in conditioning the Plaintiff's return to the show only after October 3, 2006. and agreeing to MOVIN' OUT's demands, formulated jointly during closed door secret meetings between representatives of the Union and MOVIN' OUT;

d.       making material misrepresentations to the Plaintiff Ms. ALYSE that the terms and conditions of demanded by MOVIN' OUT regarding the Plaintiff's return to the show were a "good deal";

e.      failing and refusing to take any action to have the Plaintiff's employment reinstated after Ms. ALYSE's wrongful termination;

f.      failing and refusing to hold the show accountable for the Union rules and regulations and federal and state laws that it violated;

g.      refusing to communicate with the Plaintiff or her attorney due to Ms. ALYSE's complaints about sexual harassment, sexual and ethnic discrimination and other unfair labor practices; and

h.      disparaging and defaming Plaintiff, Ms. ALYSE and describing her as a "problem," while she was out;

100.    The foregoing allegations constitute violation of 42 U.S.C. Section 2000e-(2)(a) by the MOVIN' OUT Defendants and ACTORS' EQUITY ASSOCIATION, jointly and severally.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

### COUNT IV:  TITLE VII, 42 U.S.C. SEC. 2000e-(2)(a)(1) AND (2) AND (c), (42 U.S.C.SEC.2000e-(2) ET SEQ.), SEXUAL HARASSMENT AGAINST MOVIN' OUT DEFENDANTS AND ACTORS' EQUITY ASSOCIATION

101.    Plaintiff realleges and reavers paragraphs 1 through 100 of the Complaint, as if fully stated herein.

102.    The MOVIN' OUT Defendants violated 42 U.S.C. Section 2000e-(2)(a)(1) and (2) by limiting, segregating or and/or classifying the Plaintiff Ms. ALYSE in such a way to deprive her of employment opportunities and adversely affecting her status as an employee because of her sex and national origin.

103.    The unlawful conduct and sexual harassment committed by the MOVIN' OUT Defendants includes but is not limited to:

a       perpetrating, furthering and condoning threats, intimidation, assaults, embarrassment and humiliation of the Plaintiff by Defendant SPROSTY regarding the size of her breasts;

b.      perpetrating, furthering and condoning a pervasive work place environment of sexual harassment and sexual and ethnic discrimination and corrupt and other unfair labor practices by allowing SPROSTY and others to make sexual

statements and advances and assaults to the Plaintiff without any limits, restrictions or reprimands;

       c.     requiring the Plaintiff to undress each evening, while performing costume changes, out in open areas, where even the audience could gaze upon her naked, off stage. Stage crew in each city, not connected with the show, were also permitted to gaze upon her, as well as members of the show, including but not limited to SPROSTY, thereby increasing her anxiety and emotional distress.

       d.     permitting SPROSTY's attacks on Ms. ALYSE's breasts, until they became the subject of jokes and ridicule, with some male dancers grabbing her breasts during performances causing Ms. ALYSE great anxiety, depression and fear in performing before audiences.

       e.     refusing and failing to acknowledge its discretionary authority to extend the Plaintiff's recuperation period in an effort to exhaust the deadline to later provide an excuse fire Ms. ALYSE for her having raised issues concerning the misconduct of SPROSTY;

       f.     failing to take any action or addressing the conduct of SPROSTY that Ms. ALYSE complained of and requested be addressed prior to her anticipated return to the show;

       g.     failing to take any action or addressing the sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment created and perpetuated by SPROSTY, management and the owner partners of MOVIN' OUT;

  h. conditioning the Plaintiff's return to the show upon her signing a release exonerating defendants from all liability for the harassment and other tortious acts;

  i. conditioning the Plaintiff's return to the show upon her agreement to return only after the extended October 3, 2006 deadline to prevent her from drawing a full salary and other benefits for almost ten more months and  traveling to Japan, Hawaii and other desirous locations;

  j. discriminating between employees on the basis of sex by paying wages to employees at a rate less than the rate at it paid wages to employees of the opposite sex for equal work on jobs performed under similar working conditions with equal skill, effort, and responsibility.

  k. wrongfully terminating the Plaintiff in retaliation for her complaints of sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment.

104. ACTORS' EQUITY ASSOCIATION violated 42 U.S.C. Section 2000e-(c) by excluding and expelling from its membership and otherwise discriminating against the Plaintiff Ms. ALYSE because of her sex and national origin.

105. ACTORS' EQUITY ASSOCIATION limited, segregated and classified the membership of the Plaintiff in the Union in such a way as to deprive her of employment opportunities or liming her employment opportunities to adversely affect her status as an employee  because of her sex and national origin.

106. ACTORS' EQUITY ASSOCIATION further violated the statute by caused or attempted to cause Ms. ALYSE's employer to discriminate against Plaintiff ALYSE.

107.    The unlawful conduct and sexual harassment committed by the ACTORS'
EQUITY ASSOCIATION includes but is not limited to:

a.    allowing or taking no action to prevent threats, intimidation,
assaults, embarrassment and humiliation of the Plaintiff by Defendant SPROSTY
regarding the size of her breasts;

b.    condoning a pervasive work place environment of sexual
harassment and sexual and ethnic discrimination and corrupt and other unfair labor
practices by allowing SPROSTY and others to make sexual statements and advances
and assaults on the Plaintiff without any limits, restrictions or reprimands;

c.    failing to or taking no action to prevent the Plaintiff to be
subjected to undress each evening, while performing costume changes, out in open
areas, where even the audience could gaze upon her naked, off stage. Stage crew in
each city, not connected with the show, were also permitted to gaze upon her, as well
as members of the show, including but not limited to SPROSTY, thereby increasing her
anxiety and emotional distress.

d.    permitting SPROSTY's attacks on Ms. ALYSE's breasts,
until they became the subject of jokes and ridicule, with some male dancers grabbing
her breasts during performances causing Ms. ALYSE great anxiety, depression and fear
in performing before audiences.

e.    refusing to address and taking no action of behalf of Ms. ALYSE
regarding the serious sexual harassment, sexual and ethnic discrimination, hostile
workplace and mistreatment complaints set forth in numerous phone calls and
correspondence directed to the Union;

f.       acquiescing in conditioning the Plaintiff's return to the show only upon the Plaintiff executing a release exonerating defendants from all liability for the harassment and other tortious acts without following proper Union procedures;

g.       acquiescing in conditioning the Plaintiff's return to the show only after October 3, 2006. and agreeing to MOVIN' OUT's demands, formulated jointly during closed door secret meetings between representatives of the Union and MOVIN' OUT;

h.       making material misrepresentations to the Plaintiff Ms. ALYSE that the terms and conditions of demanded by MOVIN' OUT regarding the Plaintiff's return to the show were a "good deal";

i.       failing and refusing to take any action to have the Plaintiff's employment reinstated after Ms. ALYSE's wrongful termination;

j.       failing and refusing to hold the show accountable for the pervasive environment of sexual harassment and the violation of Union rules and regulations and federal and state laws;

k.       refusing to communicate with the Plaintiff or her attorney due to Ms. ALYSE's complaints about sexual harassment, sexual and ethnic discrimination and other unfair labor practices; and

l.       disparaging and defaming Plaintiff, Ms. ALYSE and describing her as a "problem," while she was out.

108.    The foregoing allegations constitute violation of 42 U.S.C. Section 2000e-(2)(a)(1) and (2) by the MOVIN' OUT Defendants and ACTORS' EQUITY ASSOCIATION, jointly and severally.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT V:  TITLE VII, 42 U.S.C. SEC. 2000e-(2)(d), UNLAWFUL DISCRIMINATION ON THE BASIS OF SEX AND NATIONAL ORIGIN CONCERNING APPRENTICESHIP AND ON THE JOB TRAINING AGAINST MOVIN' OUT DEFENDANTS AND ACTORS' EQUITY ASSOCIATION

109.    Plaintiff realleges and reavers paragraphs 1 through 108 of the Complaint, as if fully stated herein.

110.     Defendants denied from Plaintiff a promised apprenticeship to learn the lead role of Judy in the show Movin' Out due to discrimination on the basis of sex and national origin.

111.    The foregoing allegations constitute violation of 42 U.S.C. Section 2000e-(2)(d) by the MOVIN' OUT Defendants and ACTORS' EQUITY ASSOCIATION, jointly and severally.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT VI:  VIOLATION OF AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. 12101 ET SEQ. BY MOVIN' OUT DEFENDANTS

112.    Plaintiff realleges and reavers paragraphs 1 through 111 of the Complaint, as if fully stated herein.

113.    The MOVIN' OUT Defendants violated 42 U.S.C. Section 12101 et seq. by discriminating against the Plaintiff, Ms. ALYSE, with regard to advancement, discharge, and other terms, conditions and privileges of employment due to the disability the Plaintiff she suffered due to injuries she sustained while employed as a dancer and actress on the Movin' Out Tour.

114.    The MOVIN' OUT Defendants engaged in conduct which limited, segregated, or classified Ms. ALYSE in a way that adversely affected the opportunities or status because the disability the Plaintiff suffered due injuries she sustained while employed as a dancer and actress on the Movin' Out Tour.

115.    The MOVIN' OUT Defendants engaged in conduct which excluded or otherwise denying equal jobs or benefits to Ms. ALYSE because of the disability the Plaintiff suffered due to the injuries she sustained while employed as a dancer and actress on Movin' Out Tour.

116     The MOVIN' OUT Defendants did not make reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability, Ms. ALYSE, who was employed by MOVIN' OUT.  MOVIN' OUT has not shown that the accommodation would have imposed an undue hardship on the operation of its business.

117.    The unlawful conduct committed by the MOVIN' OUT Defendants includes but is not limited to:

        a.    refusing and failing to acknowledge its discretionary authority to extend the Plaintiff's recuperation period in an effort to exhaust the deadline to later provide an excuse fire Ms. ALYSE;

b.      conditioning the Plaintiff's return to the show after she  sustained injuries upon her signing a release exonerating defendants from all liability for the harassment and other tortious acts;

c.      conditioning the Plaintiff's return to the show upon her agreement to return only after it extended the deadline to October 3, 2006 to prevent the Plaintiff from drawing a full salary and other benefits for almost ten more months and  traveling to Japan, Hawaii and other desirous locations;

d.      conspiring with the Plaintiff's union and workers' compensation carrier to delay the Plaintiff's treatment of injuries she sustained while employed as a dancer and actress on Movin' Out Tour;

e.      wrongfully terminating the Plaintiff on the basis of her disability.

118.   The foregoing allegations constitute violation of the ADA by the MOVIN' OUT Defendants.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT VII:  VIOLATION OF THE EQUAL PAY ACT OF 1963, 29 U.S.C. 206(d) ET SEQ. AGAINST MOVIN' OUT AND ACTORS' EQUITY ASSOCIATION

119.   Plaintiff realleges and reavers paragraphs 1 through 118 of the Complaint, as if fully stated herein.

120.   MOVIN' OUT discriminated between employees on the basis of sex by paying wages to employees at a rate less than the rate at it paid wages to employees of

the opposite sex for equal work on jobs performed under similar working conditions with equal skill, effort, and responsibility.

121.   ACTORS' EQUITY ASSOCIATION caused or attempted to cause MOVIN' OUT to discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate at it paid wages to employees of the opposite sex for equal work on jobs performed under similar working conditions with equal skill, effort, and responsibility.

122.   The foregoing allegations constitute violation of the Equal Pay Act of 1963 by MOVIN' OUT and ACTORS EQUITY ASSOCIATION.

**WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

## COUNT VIII:  CONSPIRACY AGAINST AGAINST ACTORS' EQUITY ASSOCIATION MOVIN' OUT DEFENDANTS AND LIBERTY MUTUAL

123.   Plaintiff realleges and reavers paragraphs 1 through 122 of the Complaint, as if fully stated herein.

124.   Defendants, each and every one of them, jointly and severally, entered into a conspiracy to further and commit the overt acts and practices with the intent and effect of severely damaging Plaintiff, financially, emotionally and physically including but not limited to:

      a.   failing to take any action or addressing the sexual

harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment created and perpetuated by SPROSTY, management and the owner partners of MOVIN' OUT;

      b.    perpetrating, furthering and condoning a pervasive work place environment of sexual harassment and sexual and ethnic discrimination and corrupt and other unfair labor;

      c.    allowing SPROSTY and others to make sexual statements, advances and assaults on the Plaintiff without any limits, restrictions or reprimands;

      d.    failing to take any action or addressing the conduct of SPROSTY that Ms. ALYSE complained of and requested be addressed prior to her anticipated return to the show;

      e.    effectively excluding and expelling the Plaintiff from her membership in the Union by refusing to communicate with her;

      f.    limiting, segregating and classifying the membership of the Plaintiff in the Union in such a way as to deprive her of employment opportunities or liming her employment opportunities to adversely affect her status as an employee because of her sex and national origin;

      g.    allowing or taking no action to prevent threats, intimidation, embarrassment and humiliation of the Plaintiff by Defendant SPROSTY regarding the size of her breasts;

      h.    failing to or taking no action to prevent the Plaintiff to be

subjected to undress each evening, while performing costume changes, out in open areas, where even the audience could gaze upon her naked, off stage. Stage crew in each city, not connected with the show, were also permitted to gaze upon her, as well as members of the show, including but not limited to SPROSTY, thereby increasing her anxiety and emotional distress.

       i.     denying the Plaintiff a promised apprenticeship to learn the lead role of Judy in the show Movin' Out;

       j.     discriminating against the Plaintiff, Ms. ALYSE, with regard to advancement, discharge, and other terms, conditions and privileges of employment due to the disability the Plaintiff;

       k.     engaging in conduct which excluded or otherwise denied equal jobs or benefits to Ms. ALYSE;

       l.     failing to make reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability, Ms. ALYSE, which resulted from injuries she sustained while employed;

       m.     refusing and failing to acknowledge its discretionary authority to extend the Plaintiff's recuperation period in an effort to exhaust the deadline to later provide an excuse fire Ms. ALYSE;

       n.     conditioning the Plaintiff's return to the show after she sustained injuries upon her signing a release exonerating defendants from all liability for the harassment and other tortious acts;

       o.     conditioning the Plaintiff's return to the show upon her agreement to return only after it extended the deadline to October 3, 2006 to prevent

51

the Plaintiff from drawing a full salary and other benefits for almost ten more months and  traveling to Japan, Hawaii and other desirous locations;

        p.      delaying the Plaintiff's treatment of injuries she sustained while employed as a dancer and actress on Movin' Out Tour;

        q.      making fraudulent misrepresentations to the Plaintiff regarding medical treatments and promising payment of same; and

        r.      wrongfully terminating the Plaintiff on the basis of her disability and in retaliation for her complaints of sexual harassment, sexual and ethnic discrimination, and the pervasive hostile work place environment.

        **WHEREFORE**, Plaintiff prays for compensatory and actual economic and non-economic and punitive damages, an award of attorneys' fees and costs in excess of $100,000,000.00 and such other relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

        Plaintiff, ALICE ALYSE, demands a jury trial on all issues so triable.

                            Respectfully submitted,

                            LARRY KLAYMAN, ESQ.
                    **THE KLAYMAN LAW FIRM, P.A.**
                    ATTORNEYS FOR PLAINTIFF
                        Fla. Bar No.:  0246220
                  601 Brickell Key Drive, Suite 404
                      Courvoisier Building  II
                          Miami, FL 33131
                        leklayman@bellsouth.net

Tel: 305/579-3455
Fax: 305/579-3454

Date:  June 27, 2006

# DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:  Alice Lewizke    aka Alice Alyse | From:  Miami District Office - 510<br>2 South Biscayne Blvd<br>Suite 2700<br>Miami, FL 33131 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 510-2006-01160 | Debrick Slater,<br>Investigator | (305) 808-1757 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other (briefly state)    **No Jurisdiction - Respondent located in New York**

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Federico Costales,
District Director

MAR 2 9 2006

*(Date Mailed)*

Enclosure(s)

cc:  Abbie Strassler
     General Manager
     **MOVIN' OUT TOUR CO., LP**
     250 W. 52nd Street
     4th Floor
     New York, NY 10019

     Larry Klayman, Esq.
     Klayman Law Firm
     Courvoiser Center II
     601 Brickell Key Drive
     4th Floor
     Miami, FL 33131

## Information Related to Filing Suit
## Under the Laws Enforced by the EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**Private Suit Rights --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day
period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the
date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent
that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is
signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after
talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement
of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the
charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.
Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be
brought where employment records are kept, where the employment would have been, or where the
respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk
of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy
decisions for you.

## Private Suit Rights -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before
7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is
separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also
plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90
days of this Notice and within the 2- or 3-year EPA back pay recovery period.

## Attorney Representation -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

## Attorney Referral and EEOC Assistance -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be
made within the next 90 days.)

*If You File Suit, Please Send a Copy of Your Court Complaint to This Office.*

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
ALICE ALYSE

**DEFENDANTS**
ACTORS' EQUITY ASSOCIATION ET AL.

**(b)** County of Residence of First Listed Plaintiff  MIAMI-DADE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  NEW YORK
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

THE KLAYMAN LAW FIRM, P.A.
601 BRICKELL KEY DRIVE, SUITE 404
MIAMI, FLORIDA 33131

Attorneys (If Known)

06-21627

CIV JORDAN

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

KLEIN

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury - Med. Malpractice | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☒ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S)
(See instructions second page)

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☑ YES ☐ NO

JUDGE MORENO    DOCKET NUMBER 06-21075-CIV

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

28 U.S.C. 1331, 29 U.S.C. 185, 42 U.S.C. 2000e-5 et seq., 29 U.S.C. 206(d)

EMPLOYMENT DISCRIMINATION
LENGTH OF TRIAL via 21 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 100,000,000.00

CHECK YES only if demanded in complaint
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  6/27/06

**FOR OFFICE USE ONLY**

AMOUNT $ 350  RECEIPT # 942646